NOT DESIGNATED FOR PUBLICATION

No. 123,969

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of L.J., T.G., A.V., A.R., and H.Q.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KELLIE HOGAN, judge. Opinion filed November 19, 2021.
Affirmed.

*Alexander P. Robinson*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for
appellant natural mother.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and WARNER, JJ.

PER CURIAM: Mother appeals the termination of her parental rights over L.J.,
T.G., A.V., A.R., and H.Q. The primary basis for the district court's termination of
Mother's parental rights was that she lacked the cognitive ability to care for children.
Though case workers worked with Mother for over three years, they saw no progression
in Mother's parenting skills. Because the record supports the district court's finding, we
affirm.

FACTUAL AND PROCEDURAL HISTORY

In July 2017, the State filed petitions alleging that Mother's four daughters—L.J.,
T.G., A.V., and A.R.,—were children in need of care (CINC). The girls entered police

1

protective custody after police conducted a welfare check at Mother's home. The children were dirty. The home was cluttered and dirty, and it smelled like feces. The kitchen was infested with cockroaches and other insects. T.G. had a soiled diaper with a cockroach inside. A.V. had a soiled diaper, feces in her hair, and fresh feces on her shirt. A.R. also had a soiled diaper. The four children had three different alleged fathers who did not participate in the case.

The children were placed in the temporary custody of the State. Mother entered a statement of no contest to the petition. The matter came for adjudication before the district court in September 2017 and the court found that the children were in need of care.

From the beginning of the case, it was apparent that Mother had some cognitive issues. Case workers would ask Mother for things multiple times, like pay stubs or utility bills, and Mother would forget to bring them. Mother was expected to bring everything she needed to care for her children during visits, including food and activities. But she sometimes forgot to bring these things. The girls' foster parents would pack a backup meal in case Mother forgot, which was not typical according to Mother's case worker.

Heather Smith, a family support worker at Saint Francis, was assigned to the family's case from July 2017 through November 2019. Smith said she discussed age-appropriate activities for the children with Mother multiple times and Mother would seem to understand, but then by the next visit Mother would have forgotten what they talked about. The food that Mother brought was often insufficient in quality or quantity. For example, once she brought the girls each one taco from Taco Bell; another time she had them share a large fry from McDonalds. Another time she brought two cheeseburgers and one order of fries and had the girls share them. Mother said she did not have enough money to provide adequate food. Case workers discussed cost effective foods with Mother multiple times and simplified it as well as they could. They broke down the costs

2

of homemade food, like peanut butter and jelly sandwiches with fresh fruit or vegetables, versus the costs of fast food. Mother would say that she understood but she would continue to exhibit the same behaviors and bring the same things. The case workers believed that mother "desperately need[ed] to complete a nutrition class so she [could] understand the importance of providing nutritious and healthy meals for her daughters."

The case workers who observed Mother's visits with her children also had concerns about her ability to parent in other ways. Camille Cortez, who was assigned to Mother's case from August to October 2018, noticed that Mother failed to correct or redirect the children's behavior and that it was difficult for Mother to focus on more than one child at a time. Smith believed Mother's inability to supervise all of the children at once raised safety concerns because the children could get injured or run off. She also noted that Mother failed to set appropriate boundaries for the children or redirect them when they misbehaved. Troy Daugherty, a case manager assigned to the family between November 2018 and September 2019, had similar concerns. He believed "the children were not being parented very much during those visits and kind of just did whatever they pleased." For example, they would run around, throw items, make messes, and fail to pick up after themselves and Mother would not do anything about it. Smith spent "a lot of time during these specific visits to help Mother with parenting skills, trying to teach her, show her how to keep all of the children kind of under control during visitations."

Despite these issues, Mother's case workers decided to progress her visits with the children at Saint Francis from supervised to monitored in early 2018. Smith saw minimal changes in Mother after the visits changed to monitored. While Mother could focus on one concept per visit, such as not letting the children spin in a swivel chair, she did not progress overall in addressing the children's chaotic and rowdy behavior.

Over a year after the children entered State custody, Mother's case workers were "unsure if [Mother would] cognitively be able to care for all of her children." At that

3

time, the case workers were "unsure if [Mother] need[ed] to be taught the same thing multiple times in order for her to learn if that is the way to do it or if [Mother] is just too low functioning to care for her children." Mother's case workers recommended that Mother obtain a psychological evaluation to determine Mother's mental capacity.

The evaluation occurred over two appointments with Dr. Derek Parker. Case worker Daugherty made the appointments for Mother because he was not sure if she was capable of following through with scheduling it on her own. Mother did not have a driver's license, so Daugherty also drove her to the appointments. It concerned Daugherty that Mother did not have a driver's license because parents need reliable transportation.

Dr. Parker administered a battery of tests to Mother and prepared a report. The evaluation showed that Mother's "general cognitive ability is within the Borderline range of intellectual functioning." The evaluation also revealed the Mother had difficulty retaining short-term memories and converting them into long-term memories. Mother's "overall cognitive functioning [was] within the Extremely Low Average range." While the memory impairment made it difficult for Mother to hold and manipulate new information, Dr. Parker concluded that "[d]eficits in cognition do not necessarily inhibit her ability to adapt to domestic life, given the opportunity to learn . . . . [Mother] is able to learn with repetition."

After evaluating Mother, Dr. Parker also diagnosed Mother with major neurocognitive disorder (mild intellectual disability), avoidant/schizoid personality type disorder, melancholic persistent depression, and general anxiety. He explained that anxiety and depression can aggravate memory issues. However, he believed that Mother's diagnoses could go into remission if Mother adhered to a medication regimen and engaged in behavioral therapy.

Dr. Parker's June 2019 recommendation that Mother engage in behavioral therapy was incorporated into Mother's court orders. However, Mother had not begun behavioral therapy by the time of the termination hearing in late 2020. She explained that she called about 10 places about obtaining the therapy. The first place she called was full, the next place referred her back to the first place, and the rest of the places she tried were not taking new patients due to the COVID-19 pandemic. Mother was taking medicine for depression and anxiety at the time of the hearing.

In August 2018, Mother informed case workers that she was pregnant. The news concerned Smith because Mother was already having a difficult time parenting, and the addition of an infant could make things more difficult. Mother said she wanted the child's father (Father) to start attending visitation with her and her daughters. Smith began working with Father and the child, a boy named H.Q., in January 2019 after H.Q. was born. Shortly thereafter, Mother and Father married and maintained a home together which case workers believed was appropriate for reintegration.

The district court held a temporary custody hearing in February 2019 and ordered H.Q. to remain in the temporary custody of DCF in an out-of-home placement. In May 2019, Mother and Father each entered a statement of no contest to the CINC petition. The district court found that H.Q. was a child in need of care.

During these initial months of Father's participation in the CINC case, Mother and Father had monitored visits with the children at Saint Francis. They had three visits per week—two with H.Q. and one with all five children. Father could not make it to all of the visits with H.Q. because he was working.

Smith believed that Mother "had a difficult time" parenting newborn H.Q. Smith had to help Mother prepare a bottle and determine how much formula to add to the water. Mother wanted to feed H.Q. at every visit and "had a difficult time knowing when he was

5

hungry and when he was not hungry." Smith discussed this with Mother and Mother would seem to understand, but then Mother would do the same thing the following week. The "theme" to Mother's parenting, according to Smith, was that week after week Mother had to be reminded of things that had already been discussed and that she had difficulty completing new tasks.

Smith believed visits became more chaotic after H.Q. was added. Despite this, visitation progressed into supervised visits at Mother and Father's home in June 2019. Once the visits moved into the home, Father was able to attend all of them. Moving the visits into the home also added to the chaos that had become characteristic of the visits, according to Smith. Visits were more difficult because, instead of being contained in one room at Saint Francis, the children had multiple rooms to go into. Smith said it was hard to supervise the children because "[t]hey were just all over the place." The children would not listen to Mother when she summoned them or asked them not to jump on the bunk beds. Father "did do a better job of keeping track of the children." He would corral the children and get involved if they were doing something unsafe. If Mother had been alone with the children, Smith did not think that Mother "would be able to provide safety for them" and "to be able to watch all of them all at one time."

Mother was not overfeeding H.Q. as much when visits moved to the home and she and Father began preparing appropriate meals for the children. But after a few visits, Smith had many of the same concerns she had when visits were in the office. Smith was still worried for the children's safety due to their jumping on furniture and roughhousing. Further, she was concerned with the general lack of supervision during the visits. Smith continued offering coaching and solutions to Mother. Smith thought it was "very difficult for [Mother] to understand, remember conversations that we had about the concerns."

During the visits, Father mainly focused on H.Q. and not the other four children. Saint Francis workers encouraged Father to discipline the girls as if they were his own

children because he would be serving as a father figure for all of the children if they reintegrated. Father had not realized that it was appropriate for him to discipline another person's children, but after discussing it with case workers Father was receptive to the idea. After this discussion, Father progressed in parenting the children. He was more successful in getting the girls' attention and getting them to listen when he tried to discipline or redirect them.

Despite the improvements that followed the discussion with Father, Smith maintained her overall concerns about reintegrating the children with Mother and Father. The main concern stemmed from the fact that Father planned to leave the children with Mother while he worked and Mother's ability to parent the children and keep them safe. Smith spoke with Mother and Father about finding an appropriate relative that could help with childcare when Father was not available, but they did not find anyone who could assist. The case workers cautioned Mother and Father that because Mother would be the primary caregiver while Father worked, Mother would have to demonstrate proper parenting.

The State moved to terminate Father's parental rights as to H.Q. and Mother's parental rights as to all five children in August 2019. In a court report prepared shortly before the motion to terminate was filed, Daugherty stated that "[Mother] and [Father] have done a good job completing court orders, but simply seem incapable of parenting the children." At the termination hearing, Daugherty added that while Mother and Father completed case plan tasks they "did not demonstrate that they got the usefulness out of those tasks that they needed."

Though the State filed its motion to terminate in August 2019, the termination hearing did not begin until November 2020. Visitation continued in the interim. Leanne Wonser, a permanency specialist with Saint Francis, took over the family's case in September 2019. Like the other case workers involved with the family, Wonser believed

Father did well interacting with and monitoring the children. Mother, on the other hand, struggled with managing all of the children at once. This had "implications for safety of the children should [Father] not be present to oversee and monitor the children."

A visitation report prepared in October 2019 noted that Father showed "appropriate supervision and parenting skills as to all five children during visits." Mother was "able to supervise and parent one child at a time, but it continue[d] to be difficult for her to parent all five." Visits with all five children were still supervised in the parents' home. Case workers wanted to progress the visits to monitored, but L.J. expressed discomfort with being left alone with Mother and Father. Saint Francis made a referral for family therapy to help the children feel more comfortable. Visits with H.Q. had already progressed to monitored in the home.

Visits never progressed to monitored in the home because in January 2020 concerns arose about domestic violence between Mother and Father. According to Wonser, Mother arrived early to a case plan meeting with her sister and a friend. She then disclosed to Wonser that Father had been physically aggressive with her that weekend. Mother had several injuries, including a grapefruit-sized bruise on her leg, scratches on her neck, and a distinct handprint bruise on her inner thigh. When Wonser asked Mother if Father had been this aggressive before, Mother said, "'Not this bad.'" Wonser asked if Mother feared for the children, and Mother said she did not think Father would hurt H.Q. but he might hit the girls. Wonser advised Mother to file for a protection from abuse order, but Mother never did.

Domestic violence concerns arose again in the spring of 2020. Mother met with Wonser and recently assigned family support worker Tate Strasner. Strasner questioned Mother about a bruise that he observed on the left side of her face. Mother explained that her sister's daughter bumped her at a birthday party three days earlier. However, the case workers had not observed the bruise the previous day at visitation. When the case

8

workers called Mother's sister to attempt to verify the story, the sister said she had not seen Mother for more than two weeks. After this, Mother called the case workers to say she was confused when talking to the case team and it was actually her other sister's daughter who bumped into her. Mother added that Father had "not laid hands on her since April." Strasner asked what happened in April. Mother said Father "had gone to hit her but she 'put a stop to it.'" Strasner called Mother's other sister but was unable to validate Mother's story.

The next incident that concerned workers was in September 2020. Mother and Father arrived at a case planning meeting in separate vehicles. Mother said this was because she had an appointment after the meeting. Mother had a large bruise, about the size of a softball, on the left side of her neck and a vertical line of faint bruises on the right side of her neck. Strasner believed the bruises looked like they were made by a hand. Mother described these as "romantic bruises" and said she was doing well with Father. Mother also had a three-inch scrape on her leg. Mother said she got the scrape when she fell while running. However, in later visits Strasner heard Mother tell the children that she could not run because she had asthma.

In a following visit, Strasner noticed that Mother's glasses were missing and she had a scrape above her eye. Mother told Strasner that she was at her niece's birthday party at a playground when a boy ran up and kicked her in the face, breaking her glasses. Later, Strasner heard her tell the children that she was going down a slide face-first and a boy did not see her and ended up hitting her and breaking her glasses. He attempted to validate Mother's story with Mother's sisters but could not get in contact with them.

At the termination hearing, Mother testified that Father had never engaged in domestic violence against her. She denied reporting to case workers in January 2020 that Father hit her, explaining that it was her sisters who made the report because they did not like her. Mother said she denied her sister's allegations that Father engaged in domestic

9

violence. She also said she did not recall sharing her fear that Father may be aggressive toward the girls. Father also denied the existence of domestic violence in the home. He said that Mother got the injuries observed in January 2020 when they were arguing, and she ran away and fell.

Following the domestic violence allegation in January 2020, visits reverted to supervised visits at the Saint Francis office. Visits remained supervised until the time of the termination hearing at the end of 2020.

Strasner supervised his first visit with the family in February 2020 at the Saint Francis office. He described it as "chaotic." Strasner explained: "Generally, the children will run all around the room, climb on the furniture, food will be spilled or thrown, and they won't listen to instruction. Boundaries aren't set and followed through with, so the children continue throughout the visit generally with their chaotic behavior." At that particular visit, the children were fighting over a toy and there was potential for a child to be hurt on the toy. Mother and Father asked the children repeatedly to get off the toy, but the children would not and the parents failed to set consistent boundaries. One of the children ended up falling off of the toy.

Due to the COVID-19 pandemic, visits occurred over the phone from March 2020 to May 2020. They returned to the Saint Francis office for just over a month, and then went back to phone visits due to COVID-19 at the end of June 2020. In-person visits resumed in August 2020 and were conducted at a local park.

When visits changed to phone calls, the girls began exhibiting more hostility toward Mother and Father. The girls frequently expressed that they did not want to be with Mother and Father, that Mother and Father are not their parents, and that they hate Mother and Father. Mother tried to engage the children to the best of her ability, Strasner reported, but the girls returned her advances with hostility. When visits returned to in-

10

person this behavior continued. Strasner did not hear "a single positive response or desire regarding visitation with their parents" from the girls. He consistently heard them say that they did not want to visit and that they just wanted the visit to be over.

During 2020, the girls also began getting physically aggressive with Mother and Father by doing things like hitting, slapping, and kicking them. The aggression peaked when face-to-face visits resumed in August 2020.

Father was very quiet during the visits that Strasner observed, and he spent a majority of his time with H.Q. He made some attempts to engage with the girls, but the girls were not receptive.

Strasner had several concerns after observing Mother and Father at visitation. He thought that Mother and Father "seem[ed] to struggle with setting and maintaining boundaries." The children would jump on furniture, throw and spill food, and grab fistfuls of dirt and throw them at the parents. Overall, Strasner did not see "a single visit where there's no misbehaving" or "a single visit where there's quiet playing or where there seems to be a cordial, conductive relationship between the parents and the children." This was a stark contrast to Strasner's observation of the children in their foster home. Wonser also observed the children in the foster home at least eight times and described them as "[v]ery settled and calm."

Strasner also worried about the safety of the children at visits because they would run in different directions and refuse to stay with the group. Strasner found himself making a suggestion at least once per visit addressing safety concerns. He testified that he would "absolutely" have safety concerns if he was not present with visitation. He was not even prepared to move the visits to monitored. To change the visits from supervised to monitored, he said, the hitting and kicking would need to be addressed and there would

11

need to be consistent boundaries put in place. The parents would also "need to learn to be more aware of what their children are doing and learn to keep them together."

Finally, Strasner had some concerns over the parents' management of the children's food. On several occasions, he saw the parents offer H.Q. food that was not age appropriate. There was an incident where H.Q. choked on a piece of chicken that was not cut small enough. The parents gave H.Q. other foods that presented choking hazards, like a Dorito chip and a whole slice of pizza. Strasner also thought the parents did a poor job monitoring how much food the children ate despite being asked to do so by case workers.

Strasner had "no doubt that these parents love their children." But he did not see any improvement in Mother and Father's parenting skills during the visits despite consistent coaching. The relationship between Mother and the children, in particular, seemed "irreparable at this point given the age of the children and their interactions with her."

The district court conducted a termination hearing as to the parental rights over all five children over two days in November and December 2020. Several case workers testified as to the facts of the case and their opinions on reintegration. Mother and Father also testified.

Valerie Kabutu, a therapist at Saint Francis, testified as to her observations of Mother and the children. She first assessed the Mother and the girls utilizing the Marschak Intervention Method over the course of five visits beginning in December 2018. During these visits, the children often misbehaved with limited boundaries or correction. After these visits, Kabutu's general concerns included safety, setting limits, and providing positive attention to the children. Kabutu provided a parent-child assessment in March 2020. After revisiting the family, Kabutu's concerns remained unchanged. The children misbehaved during the assessment, but Mother failed to correct

or discipline them. Mother struggled to handle the children all together because she could not watch all of them at the same time. Kabutu was concerned that if the children were left with Mother for an extended period of time, Mother would not be able to safely care for them.

Marque Schulte, a licensed clinical master's social worker who works for a community mental health center, provided therapy to L.J. and T.G. Schulte saw the girls consistently over three years. Schulte did not believe the visits with Mother was beneficial to the girls' mental health.

Amanda Galloway, a reintegration supervisor at Saint Francis, worked on the case for the two years preceding the termination hearing. When Galloway took over the case, her concerns centered on Mother's ability to engage with and parent all five children during visitation. Galloway testified that none of her concerns regarding parenting had been alleviated during her time on the case and she did not think there had been any progression in parenting.

Galloway was asked if she would have concerns reintegrating just H.Q. with Father. Galloway responded affirmatively because Mother resides with Father and would provide childcare, and Galloway did not think Mother should be left alone with him. She also worried about the domestic violence allegations. However, she did not think the parents were asked to take any domestic violence classes and had not seen anything added to the case plan that would address domestic violence.

Wonser, the family's permanency specialist from September 2019 to the time of the termination hearing, had similar concerns with Mother's capacity to parent, the allegations of domestic violence against Father, and Father's lack of relationship with the girls. Her biggest area of concern was supervision of the children and parenting capacity. Wonser also believed there was no improvement in parenting of the children since she

became involved with the case. She was worried about "[t]he neglect of the children due to Mom's inability to adequately provide and supervise the children" if Father left the children with Mother while he was working. Wonser did observe a visit with H.Q. and said it went well. Both parents engaged with H.Q. and "it seemed that his needs were being met in that visit."

Strasner also testified as to his overall concerns about Mother and Father's ability to parent the children. Like the others, Strasner was concerned with the domestic violence allegations, the parents' ability to feed the children appropriately, and the parents' ability to supervise the children. He did not see any improvement in Mother or Father's parenting skills or discipline during his time on the case.

The district court entered an order terminating Mother's parental rights in January 2021. The court found clear and convincing evidence that Mother was unfit, citing K.S.A. 2020 Supp. 38-2269(b)(1), (b)(7), (b)(8), and (b)(9), and that her condition was unlikely to change in the foreseeable future. After considering the physical, mental, and emotional health of the children, the court concluded that termination was in their best interests. The court also terminated Father's parental rights as to H.Q.

Mother appealed.

ANALYSIS

"A parent has a fundamental liberty interest in his or her relationship with the child, so the allegations of conduct that form the basis for termination must be proved by clear and convincing evidence." *In re R.S.*, 50 Kan. App. 2d 1105, 1115, 336 P.3d 903 (2014) (citing *Santosky v. Kramer*, 455 U.S. 745, 769-70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 [1982]). If a child has been adjudicated to be a child in need of care, then a court may terminate parental rights "when the court finds by clear and convincing evidence that the

14

parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). After making a finding of unfitness, the court must consider whether the termination is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(g)(1). In making this determination, the court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1).

When an appellate court reviews a district court's termination of parental rights, it should "'consider whether, after review of all the evidence, viewed in the light most favorable to the State,'" it is "'convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parents' right should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on any clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Mother argues that the district court erred in finding that she was unfit and her unfitness was unlikely to change in the foreseeable future. She also challenges the district court's holding that termination was in the children's best interests.

A. *The evidence, when viewed in the light most favorable to the State, supports the district court's finding that Mother was unfit.*

Mother first challenges the evidence supporting the district court's unfitness decision. The district court cited several statutory factors in support of its unfitness finding, including "[e]motional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child [K.S.A. 2020 Supp. 38-

15

2269(b)(1)]"; "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family [K.S.A. 2020 Supp. 38-2269(b)(7)]"; and "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child [K.S.A. 2020 Supp. 38-2269(b)(8)]." The district court also cited K.S.A. 2020 Supp. 38-2269(b)(9) and (c)(3), which provide that when a parent fails "to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home" the court can consider whether "the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

    i.    *K.S.A. 2020 Supp. 38-2269(b)(1)—"[e]motional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child"*

Mother first argues that there was no evidence that she suffered from a mental illness or deficiency of such a duration as to render her unable to care for the needs of the children. To support its finding on this factor, the district court noted that "Mother has significant cognitive disabilities which interfere with her ability to provide appropriate care and supervision for her children." It also found that "[d]espite over three years of services, Mother is unable to adequately supervise her children during visitation. She is unable to set rules or enforce discipline." Further, "St. Francis regularly assists [M]other to adequately parent her children during visitation, but [M]other is not able to make any progress in her parenting skills."

Mother argues that while Dr. Parker diagnosed her with several conditions, he never "testif[ied] that Mother's mental health diagnoses make her unable to care for the ongoing physical, mental, and emotional needs of her children." Further, she argues that

16

simply "[b]eing below average intellectually cannot make a parent unable to care for the ongoing needs of her children." So "[m]aking average the cutoff for who is unfit means 50% of parents would be unfit under [K.S.A. 2020 Supp. 38-2269(b)(1)], because by definition, 50% of parents will be below average in these areas."

Mother's argument mischaracterizes the district court's decision. The district court did not impose a bright-line rule that all parents who have below average intellectual functioning are unfit. Its decision was not based solely on Mother's diagnoses. Rather, the district court looked at Mother's actions over the three-year span of the case.

The record supports the district court's finding on this point. When the children entered State custody, they were dirty and living in an insect-infested home. Kabutu evaluated the family in 2018-19 and 2020 and observed no change in Mother's parenting skills, the same parenting skills that resulted in the children being removed from Mother's home. Kabutu did not believe Mother could supervise, discipline, or safely care for the children. These concerns were shared by numerous case workers. Smith, who worked with the family for over two years, was concerned for the children's safety due to Mother's inability to supervise all of the children and her failure to set appropriate boundaries for the children or redirect them when they misbehaved. Strasner, who worked on the case during the months before the termination hearing, testified as to safety concerns that arose from Mother's failure to adequately supervise the children, set appropriate boundaries, and discipline the children. He was also concerned that Mother failed to adequately monitor the children's food intake and that she provided foods to H.Q. that were not age appropriate. Additional testimony from Cortez, Galloway, Daugherty, and Wonser repeated these same concerns.

Mother also testified that she does not understand the developmental needs of all five of her children. She knew that T.G. has PTSD that causes her to get nervous and wet herself and that L.J. has a "developmental problem, but I'm not sure what it is." She

17

indicated that she had never asked L.J.'s case team or L.J.'s therapist about L.J.'s mental health diagnosis. She believed the only action needed for T.G. was to take her to a therapist. Yet Mother has never contacted T.G.'s therapist. In addition, due to the fact that she does not have a driver's license, Mother must rely on family members to take her to appointments when Father is not available. However, there was testimony that Mother has been observed driving even though her license is not valid. On the day of the hearing there was a warrant out for Mother's arrest.

In sum, the district court's holding on this point was not based solely on Mother's diagnoses, as she claims, but on her actions. While her diagnoses influenced and explained some of her actions (or inactions), the district court looked at more than the diagnoses in deciding to terminate Mother's parental rights. There was ample evidentiary support, especially when the evidence is viewed in the light most favorable to the State as this court is required to do, for the district court's conclusion on this factor.

> ii. *K.S.A. 2020 Supp. 38-2269(b)(7)—"failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family"*

Next, Mother argues that there was not sufficient evidence to support the district court's finding that there was a failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. On this point, the district court noted that Saint Francis made reasonable efforts to assist Mother for over three years, but "[d]espite multiple achievement plans, numerous evaluations, parenting classes, a parenting assessment, therapeutic parenting time, the agency has seen little to no improvement in [Mother's] ability to care adequately for her children."

Mother highlights the ways in which she did improve during the case. She notes that at the beginning of the case, she was often late to appointments or would not show up at all, she had trouble appropriately feeding the children, and she struggled to interact

18

with and discipline the children. Mother asserts that she addressed those concerns: she became punctual and reliable at visits, she fed the children appropriate food, she began disciplining the children, and she began interacting more appropriately with the children, including praising them and telling them she loved them.

It is true that Mother began attending appointments and visitation consistently and on time. Simply showing up, however, is not enough on its own to demonstrate fitness. Similarly, while it was not disputed that Mother told the children she loved them and praised them when they did well, it was reasonable for the district court to conclude that those things were not enough when weighed against the other evidence in the case.

Some of Mother's other assertions are not wholly supported by the record. Case workers did report that Mother improved the quality of meals she prepared for the children when visits moved into her home. Concerns remained, however, about how well Mother monitored the children's food intake. There were also concerns that she provided H.Q. with food that was not age appropriate. Regarding discipline of the children, there is evidence in the record that Mother made some attempts to discipline the children. But her case workers believed these attempts were insufficient. Mother would not follow through with her threats of discipline to the children and she failed to set boundaries. Case workers would model appropriate discipline, but Mother did not learn from the coaching. Mother admitted that her cognitive issues made it difficult for her to learn from her case workers, testifying: "If I get told to discipline my daughter a certain way, I will do it a different way that I think is better. Or I try and I do it their way or—but differently."

Although the record shows that Mother made some incremental gains during the years she spent working on the case, it also contains a significant amount of evidence supporting the district court's factual finding that she made little to no improvement in her ability to adequately care for the children. As discussed in the previous section, not a single case worker who testified in this case believed that Mother made adequate

19

progress. She went through the actions of completing her case plan tasks without internalizing the lessons she needed to learn.

> ### iii. *K.S.A. 2020 Supp. 38-2269(b)(8)—"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"*

The district court's finding under K.S.A. 2020 Supp. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child") was based on two factual findings. First, that Mother is unable to provide adequate supervision and discipline to the children during visitation. Second, the court cited the evidence that Father engaged in domestic violence against Mother.

Regarding the first finding, Mother makes a similar argument as with the previous factor. She asserts that "[n]o rational factfinder would be able to conclude that Mother is unable to provide adequate supervision and discipline." As has already been discussed, there was ample evidence in the record to support this finding by the court.

In response to the district court's finding about domestic violence, Mother notes that Saint Francis did not take the allegation seriously enough to follow its domestic violence protocols. While Saint Francis encouraged Mother to file a petition for protection from abuse, no one at Saint Francis encouraged her to call the police. No one at Saint Francis addressed the concerns with Father. Saint Francis did not ask Mother to separate from Father, attend couples counseling, or take domestic violence classes. Mother also cites to the conflicting testimony on whether she or her sisters reported the domestic violence. Though not mentioned by Mother, it is also worth noting that Saint Francis allowed Mother and Father to continue visiting the children together, albeit the visits reverted to supervised visits at Saint Francis rather than at the family's home.

Wonser's testimony that Mother reported domestic violence to her, coupled with the unexplained bruises that case workers occasionally observed on Mother, provided the district court with an evidentiary basis for concluding that domestic violence occurred. Mother did provide conflicting testimony, but this court does not reassess witness credibility or reweigh the evidence. Additionally, this court must look at the evidence in the light most favorable to the State. Mother is correct in noting that, other than changing visits to supervised, Saint Francis did not take any other steps to address the domestic violence concern. Given Saint Francis' lack of response to this allegation, the evidence may not have been sufficient on its own to uphold the termination order. But, when viewed in context of the rest of the evidence in the case, it does lend support to the district court's ultimate conclusion to terminate Mother's parental rights.

> iv. *K.S.A. 2020 Supp. 38-2269(b)(9)—whether, as a result of the actions or inactions attributable to the parent the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months*

The final factor that the district court considered was K.S.A. 2020 Supp. 38-2269(b)(9) and (c)(3), which provide that when a parent fails "to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home" the court can consider whether "the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home." The court held that Mother failed to carry out a reasonable plan by not completing a single case plan task—behavioral therapy as recommended by Dr. Parker. It then noted that the children (other than H.Q.) had been in State custody for over 40 months.

21

Mother admits that she did not begin behavioral therapy by the time of the termination hearing. However, she cites to her testimony where she explains that she called over 10 facilities in an attempt to comply with this order, but they were not taking new clients because of the COVID-19 pandemic. Assuming that Mother's testimony was honest, it still fails to account for the fact that Dr. Parker made his recommendation in June 2019, months before the COVID-19 pandemic began to impact Kansas. Mother provided no explanation for her failure to seek therapy during those months. Further, Mother made no effort to reach out to Saint Francis and the resources available there in securing behavioral therapy. The district court had clear and convincing evidence before it that Mother failed to complete this case plan task. The COVID-19 pandemic does not excuse Mother from compliance.

Mother also notes that she complied with every other case plan task. While this is true, the district court concluded that Mother's substantial compliance with the case plan was outweighed by evidence showing that Mother was unfit. This court does not reweigh evidence on appeal. See *In re A.W.*, No. 121,482, 2020 WL 12188985, at *9 (Kan. App. 2020) (unpublished opinion).

B. *The evidence, when viewed in the light most favorable to the State, supports the district court's finding that Mother's unfitness was unlikely to change in the foreseeable future.*

Before terminating a person's parental rights, the district court must find that the parent's unfitness is unlikely to change in the foreseeable future. Mother does not directly address this issue in her brief, thus we need not analyze the issue. Given the length of the case and Mother's lack of progress, the district court did not err in concluding that Mother's conduct or condition was unlikely to change in the foreseeable future. See *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009) ("In determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable

22

future is to be considered from the child's perspective, not the parents', as time perception of a child differs from that of an adult.").

*C.  The district court did not abuse its discretion when it found that termination of Mother's parental rights was in the children's best interests.*

Finally, Mother argues that the district court erred when it found that termination of Mother's parental rights was in the children's best interests.

A district court is required to determine whether termination of parental rights is in the best interests of a child, giving primary consideration to the physical, mental and emotional health of the child. K.S.A. 2020 Supp. 38-2269(g)(1). Pursuant to this statute, district courts must "weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives." *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010). When the district court makes this determination, it should "consider the nature and strength of the relationships between the children and parent and the emotional trauma that may be caused to the children by termination of the parental rights, weighing these considerations against a further delay in permanency for the children." 43 Kan. App. 2d 891, Syl. ¶ 7.

This court has explained the standard of review as follows:

"If the court makes a finding of unfitness, the court then must determine whether termination of parental rights is in the best interests of the child. The district court's determination in this regard is a discretionary judgment call. On appeal, the appellate court reviews the best-interests determination for abuse of discretion. A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a legal or factual error. If the district court makes any additional factual findings that relate solely to the best-interests determination, those findings may

23

be made based on the preponderance of the evidence and are reviewed on appeal to see whether substantial evidence supports them." *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2.

Mother does not argue that the district court made an error of law or fact, so the district court's decision on this issue should only be disturbed if no reasonable person would agree with the court's decision.

On this issue, Mother highlights the positive aspects of her case. As with some of her earlier arguments, her factual assertions are not all supported by the record. For example, she asserts that she appropriately disciplined the children and that case workers did not have safety concerns when the children were in Mother and Father's home. To the contrary, numerous case workers said that Mother failed to properly discipline the children or provide them with boundaries. This failure put the children's safety at risk. Mother cites to testimony from Wonser to support her assertion that case workers did not have safety concerns when the children were in Mother's home. It is true that Wonser testified that she observed one visit in Mother's home without safety concerns. But she also testified later that she had safety concerns leaving the children alone with Mother because of Mother's "inability to adequately provide and supervise the children." As has already been detailed above, the other case workers were also concerned about the children's safety with Mother.

The girls spent over three years in State custody and H.Q. spent his entire life in State custody. Mother made little to no progress in her parenting skills throughout the case. Mother's inability to supervise and provide boundaries for the children put them at risk. For these reasons, it cannot be said that no reasonable person would agree with the district court's finding that termination of Mother's parental rights was in the children's best interests.

Affirmed.

24